**Frank E. MATINCHEK**

v.

**JOHN ALDEN LIFE INSURANCE COMPANY, Appellant.**

**No. 95–7654.**

United States Court of Appeals, Third Circuit.

Argued June 3, 1996.

Decided Aug. 19, 1996.

---

**3.** Rowen filed his original brief ten days before the 1996 opinion in *Ultimate Sports Bar.*

Jonathan H. Rudd (argued), McNees, Wallace & Nurick, Harrisburg, PA, for Appellant.

Barry A. Kronthal (argued), Stephen L. Banko, Jr., Foulkrod, Reynolds & Havas, Harrisburg, PA, for Appellee.

Before COWEN, NYGAARD and LEWIS, Circuit Judges.

## OPINION OF THE COURT

LEWIS, Circuit Judge.

### I.

The question we address in this appeal is whether ERISA governs an insurance coverage dispute between Appellee Frank E. Matinchek ("Matinchek") and the John Alden Life Insurance Company. We hold that ERISA does not govern this dispute because an insurance coverage plan covering only a sole business owner and his or her immediate family members cannot qualify as an "employee welfare benefit plan" under ERISA. We also hold, as a result of our conclusion that ERISA does not govern this dispute, that the district court incorrectly determined it had federal subject matter jurisdiction based on Matinchek's ERISA claims. Accordingly, we will vacate the district court's judgment and remand the case with instructions to dismiss the case for lack of subject matter jurisdiction. Because there were facts in the record that support diversity jurisdiction, however, we note that the district court's dismissal should not prejudice Matinchek's right to amend his complaint to include his state law claims.

### II.

On October 28, 1991, Matinchek completed an enrollment form for group health insurance coverage from the John Alden Life

98

Insurance Company ("John Alden"). The enrollment form presented a series of questions regarding the applicant's health history. In response to a question regarding whether the applicant had been treated for prior diseases or disorders, including diabetes, Matinchek indicated "no." Matinchek also answered "no" to questions regarding whether he was currently taking any medication and whether he had consulted a doctor (other than his personal physician) over the past three years. App. 135a.

Prior to his application for health insurance coverage with John Alden, at least two doctors had performed blood sugar tests on Matinchek. Matinchek's blood sugar levels indicated that he had a problem with diabetes. The first doctor to make this diagnosis was Dr. Barnoski, Matinchek's family physician. Initially, sometime after July 1990, Dr. Barnoski put Matinchek on a 1500 to 1800 calorie diet. Dr. Barnoski thereafter performed four separate blood tests on Matinchek between February 6, 1991 and March 6, 1991. The blood sugar readings confirmed that Matinchek had a problem with diabetes. As a result of these readings, Dr. Barnoski prescribed and instructed Matinchek to take Glucotrol, which is an oral medication taken to lower the blood sugar in individuals suffering from non-insulin dependent diabetes. App. 82a.

Matinchek then visited Dr. Perna, a specialist in endocrinology and in the treatment of diabetes. During their initial consultation on March 27, 1991, Dr. Perna confirmed, based on a blood test and on Matinchek's medical history, that Matinchek was suffering from non-insulin dependent diabetes. Dr. Perna recommended that Matinchek follow a diabetic diet and "try to lose some weight." Dr. Perna also prescribed and instructed Matinchek to take 2.5 milligrams of Diabeta once a day. Diabeta is another oral medication that is used to lower the blood sugar in patients with non-insulin dependent diabetes. Dr. Perna continued to treat Matinchek for his diabetic condition throughout 1991 and performed additional blood sugar tests on April 16, 1991, May 7, 1991, and June 27, 1991. On March 30, 1992, Dr. Perna determined that "Matinchek's diabetes

was sufficiently under control such that I discontinued the use of Diabeta to assist in lowering his blood sugar." App. 82a–90a. During the time period in which Dr. Perna was treating Matinchek, Matinchek was taking his own finger-stick blood tests on a routine basis to monitor his blood sugar level. App. 66a–70a.

Thus, the record evidence establishes that Matinchek made at least three misrepresentations on his enrollment form. First, he did not reveal that he was suffering from a diabetic condition as of October 28, 1991, the date of his enrollment. Second, he stated that he had not been to see a doctor who was not his personal physician over the past three years when, in fact, he had made numerous visits to Dr. Perna. Third, he represented that he was not taking any medication when Dr. Perna's records suggested that he was taking (or supposed to have been taking) Diabeta.

After receiving the enrollment form, John Alden issued a health insurance policy covering Matinchek and his wife. At the end of February, 1992, Matinchek entered the hospital because of an undisclosed medical problem. To cover the hospitalization expenses, Matinchek filed a claim for benefits with John Alden on March 10, 1992. The claim included a hospital diagnosis code for diabetes mellitus. Upon discovering the diagnosis code, a John Alden claims examiner initiated an investigation to determine whether Matinchek had, in his enrollment form, failed to disclose his diabetes as a pre-existing medical condition. The examiner ordered Matinchek's medical records from the hospital. The hospital did not send Matinchek's medical records to the examiner until April 10, 1992. The records, of course, revealed Matinchek's history of treatment for his diabetic condition.

After discovering the misrepresentation in the enrollment form, the examiner referred the file to John Alden's chief underwriter, Kathy Garvey ("Garvey"). By May 1, 1992, Garvey reviewed the file and determined that John Alden would not have issued Matinchek a policy if Matinchek had provided accurate information in his enrollment form. App. 95a. Thereafter, Tracy Boldman ("Bold-

man"), a claims analyst, completed a rescission referral form and transmitted the file to the directors of the claims department to determine whether to rescind Matinchek's policy. It appears that sometime between May 1, 1992 and May 14, 1992, the directors decided to rescind Matinchek's policy.

On May 14, 1992, Boldman sent Matinchek a letter requesting Matinchek to review and correct any information that was incorrect on his enrollment form. This letter was apparently a form letter that John Alden sends out whenever an individual's policy is recommended to be rescinded. App. 99a. Matinchek received this letter on May 15, 1992. Also on May 15, 1992, a John Alden representative directed its premium services department to refund all premiums paid by the Matincheks. App. 190a. On the same day, Boldman sent a letter to Matinchek's insurance agent notifying the agent that Matinchek's coverage was being rescinded as a result of Matinchek's failure to disclose material information regarding his diabetes on the enrollment form. App. 100a.

Matinchek left home for a trip to Canada on May 18, 1992. On May 20, 1992, Matinchek was seriously injured in an auto accident in Canada when he fell asleep at the wheel and his car went over an embankment. His injuries required him to be hospitalized. Matinchek's wife reported the accident to John Alden on the day that it occurred. On May 21, 1992, the next day, John Alden sent Matinchek a letter stating that his policy had been rescinded.

After John Alden denied his claims for both the February hospitalization and for the May accident, Matinchek filed suit against John Alden, seeking to recover the benefits provided by the policy.

The district court rejected John Alden's motion for summary judgment on March 13, 1995. In its order denying summary judgment, the district court requested further briefing on the issues of waiver and estoppel. Thereafter, the district court granted summary judgment as to liability in favor of

Matinchek, holding that, as a matter of law, John Alden had waived its right to rescind the insurance policy. The district court denied Matinchek's claim for attorney's fees, costs, and prejudgment interest. John Alden then brought this appeal. Matinchek does not appeal the district court's denial of its motion for attorney's fees, costs and prejudgment interest.

### III.

The district court, in its opinion denying John Alden's motion for summary judgment, stated that:

> The instant action is governed by the Employee Retirement Income & Security Act ("ERISA"), under which a participant in an employee benefit plan may sue to "recover benefits due to him under the terms of his plan, to enforce his rights under the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Because the insurance policy falls within the ambit of ERISA, it should be interpreted according to federal law.

Dist. Ct. Op. 3. In his second amended complaint, Matinchek stated that the policy at issue in this case "constitutes an employee benefit arising out of Mr. Matinchek's employment which qualifies as a 'Welfare Benefit Plan' within the meaning of 29 U.S.C. § 1002(1)." In its answer, John Alden did not dispute this claim.[1] Thus, from the outset of this litigation, both the parties and the district court assumed that this dispute was governed by ERISA and that ERISA was the source of the district court's federal question jurisdiction. For the reasons which follow, however, we conclude that ERISA cannot give rise to federal question jurisdiction in this case.

As set forth in its findings and its declarations of policy, Congress enacted ERISA to protect participants in employee benefit plans and their beneficiaries. 29 U.S.C. § 1001. ERISA includes what we have

1. In fact, in a letter directed to Matinchek's counsel, John Alden originally took the position that ERISA governed the dispute and preempted Matinchek's state law claims. In response to

this letter, Matinchek amended his complaint to base his claims entirely on ERISA. In its supplemental brief, John Alden, in a 180 degree shift, argues that ERISA did not apply to the dispute.

100

termed a "civil actions provision," 29 U.S.C. § 1132(a)(1), which authorizes a participant in "an employee welfare benefit plan" to recover benefits due to him [or her] under the terms of the plan. *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1253 n.3 (3d Cir. 1993). An "employee welfare benefit plan" governed by ERISA is defined as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . .

29 U.S.C. § 1002(1). A "participant" is defined under ERISA as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan. . . ." 29 U.S.C. § 1002(7).

■ In interpreting a statute, even one in which Congress has delegated its legislative authority to a particular agency, we must first determine whether "Congress has spoken directly to the precise question at issue." If the intent of Congress is unambiguously expressed, we must give that intent effect. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Congressional intent in this context is anything but unambiguous. The ERISA statutory scheme does not address whether an insurance plan covering only a business owner and his or her immediate family members can qualify as an employee welfare benefit plan. In somewhat circular fashion, ERISA defines an employer as "any person acting directly as an employer or indirectly in the interest of the employer, in relation to an employee benefit plan." 29 U.S.C. § 1002(5). Similarly, ERISA defines an employee as "any individual employed by an employer." 29 U.S.C. § 1002(6). Not surprisingly, these definitions shed little light on what types of

plans can qualify as employee welfare benefit plans.

■ Congress, likely aware that there were many of these types of gaps in the ERISA statutory scheme, authorized the Secretary of Labor to "prescribe such regulations as he [or she] finds necessary or appropriate to carry out the provisions of this subchapter." 29 U.S.C. § 1135. Thus, we must look to whether the Department of Labor has addressed ERISA's ambiguities in this context and give deference to the agency's conclusions. *See Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1151 (3d Cir.1989). The Department of Labor regulations provide that:

> For purposes of title I of the Act . . . the term "employee benefit plan" shall not include any plan, fund or program . . . under which no employees are participants covered under the plan. . . . For example, a so-called "Keogh" or "H.R. 10" plan under which only partners or only a sole proprietor are participants covered under the plan will not be covered under title I.

29 C.F.R. § 2510.3–3(b). The regulations also provide that:

> An individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his or her spouse.

29 C.F.R. § 2510.3–3(c)(1).

It strikes us that the Department of Labor's regulations are eminently reasonable. The regulations are consistent with the goals of ERISA and with a common sense understanding of the terms "employer" and "employee." *See Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (holding that, under ERISA, the definitions of employer and employee are guided by traditional agency law principles). While it is certainly true that the sole owner of a business must often function in many ways as the employer and employee of that business, we cannot conclude that Congress intended that ERISA would protect a sole owner's "employee"-type

benefits (*e.g.*, insurance coverage benefits) from his or her own actions carried out as an "employer." [2] Congress clearly intended "employer" and "employee" to be mutually exclusive definitions under ERISA. *See Kwatcher v. Mass. Service Employees Pension Fund*, 879 F.2d 957, 959 (1st Cir.1989) (" 'Employee' and 'employer' are plainly meant to be separate animals; under Part I [of ERISA], the twain shall never meet"). Consistent with this intent, and by virtue of the fact that an owner cannot at once be deemed both an employer and an employee, we hold that an insurance coverage plan covering only a sole business owner and his or her immediate family members cannot qualify as an employee welfare benefit plan covered by ERISA.[3]

■ At least five courts of appeal have similarly recognized that ERISA does not govern a "plan" that is merely an insurance policy under which the only beneficiaries are the company's owners. *See Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 407 (9th Cir.1995); *Meredith v. Time Ins. Co.*, 980 F.2d 352, 357–58 (5th Cir.1993); *Fugarino v. Hartford Life & Accident Ins. Co.*, 969 F.2d 178, 185 (6th Cir.1992); *Kwatcher v. Mass. Service Employees Pension Fund*, 879 F.2d 957, 959 (1st Cir.1989); *Schwartz v. Gordon*, 761 F.2d 864, 867–69 (2d Cir.1985).[4] In addition, a district court within our Circuit has reached the same conclusion. *See Herrington v. Dreslin and Co., Inc.*, 1995 WL 429171 (E.D.Pa.1995).

The Fifth Circuit's reasoning in *Meredith* most directly supports our conclusion. In *Meredith*, the insured was a sole proprietor of a business employing herself and her husband. The insured applied for participation in a group insurance benefit plan. In her application, the insured failed to disclose certain facts regarding a series of heart and hypertension related prior conditions. The insured thereafter filed a claim to recover expenses incurred as a result of an operation to remove kidney stones. The insurer refused to pay the claim. The only issue the Fifth Circuit considered on appeal was "whether an insurance plan purchased by a sole proprietor, covering only herself and her spouse, constitutes 'an employee welfare benefit plan' as that term is defined in ERISA." 980 F.2d at 353.

The Fifth Circuit held that ERISA did not govern the insurance dispute between the insured and the insurer, recognizing that Labor Department regulations "clearly prevent the insured from being simultaneously an employer and an employee." *Id.* at 357. The court also noted that "[h]er act of purchasing insurance for herself and her husband, although done under the color of her commercial status, did not create an employee welfare benefit program." *Id.* The court, citing *Chevron*, concluded that the Labor regulations were reasonable, finding that:

> The Department of Labor has adopted an interpretation consistent with ERISA's primarily objective: "Safeguarding the well-being and security of working men and women and to appraise them of their rights and obligations under any employee benefit plan." (citation omitted). *When the employee and employer are one and the same, there is little need to regulate plan administration.* Moreover, the Department of Labor's construction of ERISA accords with the Supreme Court's adoption

---

**2.** We presume that Congress, in defining the terms employer and employee under ERISA, did not intend to recognize a legal fiction that would consider a sole business owner both an employer and employee. We are confident that, given that Congress' stated purpose in enacting ERISA was to protect participants in employee benefit plans, Congress did not intend to protect a split-personality business owner whose ego may act as an employee and whose alter-ego may act as an employer threatening to take away his or her own benefits.

**3.** We note that this holding applies to all businesses solely-owned by immediate family members, regardless of whether the owners are sole proprietors, sole shareholders, or partners.

**4.** We have noted that, in the context of ERISA, maintaining uniformity of decisions is an important consideration when fashioning federal common law rules. *Northeast Dept. ILGWU Health & Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147, 159 (3d Cir.1985). While we are certainly not bound to create uniform common law rules, we must attempt, to the extent possible, to harmonize our own federal common law rules with those of other federal courts of appeals.

of common-law principles of agency. It would appear axiomatic that the employee-employer relationship is predicated on the relationship between two different people.

*Id.* at 358 (emphasis added).

Our case differs little from *Meredith.* It is undisputed that Matinchek and his wife are the sole owners of the Matinchek Funeral Home, and that the Matincheks are the only ones covered under the John Alden insurance policy. Accordingly, we hold that the insurance agreement between Matinchek and John Alden was not an employee welfare benefit plan governed by ERISA.

### IV.

In remanding the case, we will instruct the district court to dismiss the case without prejudice to allow Matinchek to amend his complaint to include his state law claims. We note, however, that under applicable Pennsylvania law, Matinchek has little chance of carrying the day on his state law claims.

■ John Alden has a strong argument that the misrepresentations made by Matinchek in his insurance enrollment form gave John Alden the right to rescind the insurance contract. Under Pennsylvania law, an insurance contract is void if (1) the representation was false; (2) the insured knew it to be false when made or acted in bad faith; and (3) the representation was material to the risk being insured. *New York Life Insur. Co. v. Johnson,* 923 F.2d 279, 281 (3d Cir.1991); *Shafer v. John Hancock Mut. Life Ins. Co.,* 410 Pa. 394, 189 A.2d 234, 236 (1963).

The facts in the record reveal that Matinchek made three false representations in his enrollment form: (1) that he had not been treated for prior diseases or disorders (including diabetes); (2) that he was not at that time taking any medication; and (3) that he had not consulted a doctor other than his personal physician over the past three years. From the blatant nature of these misstatements, it may be inferred that Matinchek knew that his statements were false at the time he completed the enrollment form. In addition, these misrepresentations, which effectively concealed his diabetic condition, were likely material to the risk being insured given the fact that John Alden's insurance enrollment form specified diabetes as one of the diseases or disorders that must be disclosed prior to enrollment.[5]

Matinchek's principal argument is that John Alden waived its right to rescind the policy. We have held that, under Pennsylvania law, for an insurer's failure to rescind to amount to a waiver of the right to rescind, "there must be sufficient knowledge disclosed to the insurer that there is some falsity in the statement by the insured or something of some significance which would put a reasonably prudent person on notice to make further inquiry." *First Pennsylvania Banking and Trust Co. v. United States Life Ins. Co.,* 421 F.2d 959, 963 (3d Cir.1969). Under this standard, there is no requirement that, in order to avoid waiver, the insurer promptly rescind the policy upon discovering that an insured may have lied in his or her application for insurance coverage. Rather, we only required in that case that the insurer "make further inquiry" upon learning of the possible misrepresentation.

In this case, although the district court held that as a matter of law John Alden waived its right to rescind,[6] John Alden

---

5. Moreover, several state courts have held that, as a matter of law, the failure to disclose a condition of diabetes in an insurance application is material and entitles the insurer to void the policy. *See, e.g., Johnson v. Occidental Life Ins. Co. of California,* 368 So.2d 1032 (La.1979); *Martin v. Mutual of Omaha Ins. Co.,* 198 Kan. 135, 422 P.2d 1009 (1967).

6. We note that this holding conflicts with our recognition that the question of whether an insurance company has waived its right to rescind a contract or policy is a question of fact. *Barnhart v. Dollar Rent A Car Systems, Inc.,* 595 F.2d 914, 918 (3d Cir.1979); *First Pennsylvania Banking and Trust Co. v. United States Life Ins. Co.,* 421 F.2d 959, 963 (3d Cir.1969). Other circuits have similarly held waiver to be a question of fact. *See, e.g., Gallien v. Connecticut General Life Ins. Co.,* 49 F.3d 878, 885–86 (2d Cir.1995); *Intel Corp. v. Hartford Accident & Indemnity Co.,* 952 F.2d 1551, 1559 (9th Cir.1991); *Spalding v. Agri-Risk Services,* 855 F.2d 586 (8th Cir.1988); *Lathem v. Sentry Ins.,* 845 F.2d 914, 917 (11th Cir.1988); *Rosenburg v. Lincoln American Life Ins. Co.,* 883 F.2d 1328, 1334 (7th Cir.1989); *Weingart v. Allen & O'Hara, Inc.,* 654 F.2d 1096, 1104 (5th Cir.1981).

points to evidence in the record which supports its position that it clearly made "further inquiry" soon after learning of Matinchek's medical records on April 10, 1992. John Alden received Matinchek's medical records on April 10, 1992. The insurer took just over a month to determine that rescission was appropriate. During that time, Matinchek's file was prepared by the examiner and reviewed by both the chief underwriter and two directors of the claims department. Thus, John Alden's continuously active review of Matinchek's file could not have amounted to a waiver of its right to rescind. An insurance company must have the ability to investigate and deliberate before making the difficult decision to rescind an insurance policy. The decision to rescind an insurance policy may literally amount to a life-or-death decision. Needless to say, it is not a decision that should be made with any degree of haste.

■ The district court also determined that John Alden's acceptance of premiums during its investigation of Matinchek's misrepresentations constituted a waiver of its right to rescind the policy. It is certainly true that in some instances a waiver finding would be appropriate where the insurer continues to accept premiums after it has investigated and determined that it has the right to rescind. *See, e.g., Pitts v. American Security Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir.1991) (waiver found where employer accepted premium payments for five months after "learning beyond all doubt" of its defense to payment of the claim).

In this case, however, John Alden did not complete its investigation and make the decision to rescind until after the two claims department directors approved the rescission on May 13, 1992. John Alden did not accept any premiums after this date, and in fact, took immediate steps to return all of the premiums Matinchek had paid under the policy. Thus, we find it puzzling that the district court found as a matter of law that John Alden waived its right to rescind based on its acceptance of the March 29 and May 1 premium payments. John Alden had not even

received Matinchek's medical records by March 29, and on May 1, the chief underwriter was just completing her review and investigation. John Alden makes a persuasive argument that it acted prudently by waiting until it had concluded that it had the right to rescind the policy before rescinding the policy and suspending collection of premium payments.

## V.

Because we hold that ERISA did not govern the insurance coverage dispute at issue in this case, the district court was without subject matter jurisdiction. Accordingly, we vacate the district court's judgment and remand the case with instructions to dismiss the case without prejudice to Matinchek's right to amend his second amended complaint to include his state law claims.

Thus, even if we had held that ERISA applied to the insurance coverage dispute, we would have vacated the district court's grant of summary judgment in favor of Matinchek.